**IN RE: Jose Luis ALONSO and Erika M. Alonso, Debtors.**

**Bankruptcy Case No. 14–41215–JDP**

United States Bankruptcy Court,
D. Idaho.

Signed May 2, 2017

Paul Ross, Paul, Idaho, Attorney for Debtors.

Kathleen A. McCallister, Meridian, Idaho, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

Honorable Jim D. Pappas, United States Bankruptcy Judge

### Introduction

In this chapter 13[1] case, the Court is called upon to address complicated dueling motions to modify a confirmed plan. The first motion was filed by Debtors Jose Luis Alonso and Erika Molina Alonso, Dkt. No. 89; the other was filed by the chapter 13 trustee, Kathleen A. McCallister ("Trustee"), Dkt. No. 107. The Court conducted a hearing on both motions on February 21, 2017, at which the parties were asked to file briefs, which they did. Dkt. Nos. 125 and 128. Having taken the issues raised by the motions under advisement, the Court has now considered the parties' arguments, as well as the applicable law, and disposes of the motions via this decision.[2]

### Facts [3]

This chapter 13 case was filed on October 28, 2014. Dkt. No. 1. After several hearings, and considerable wrangling with Trustee, Debtors' second amended plan

---

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2. What follows constitutes the Court's findings, conclusions, and reasons for its decision. *See* Fed. R. Bankr. P. 7052; 9014.

3. These facts are derived from the Court's docket, as well as the Stipulated Facts and Documents jointly filed by Debtors and Trustee. Dkt. No. 112.

was eventually confirmed with Trustee's approval on August 17, 2015. Dkt. Nos. 63, 76. However, it did not provide 100% payment to Debtors' unsecured creditors. *Id.* Debtors' applicable commitment period is 36 months. Dkt. No. 14. The term of Debtors' confirmed plan was 54 months. Dkt. No. 6. at ¶ 2.1. And, importantly, Debtors' confirmed plan contained the following plan provision:

> Debtor(s) projects income tax refunds during the term of this plan. During the applicable commitment period of the plan, as defined in 11 U.S.C. § 1325(b)(4), the Debtor(s) will turn over to the Trustee all net income tax refunds. At any time during the term of the plan, Debtor(s) shall be entitled to use a tax refund to pay taxes due any other taxing authority; however, the Debtor(s) shall remit any net income tax refund balance to the Trustee. Upon the Trustee's stipulation with the Debtor(s) and an order of the Court, the Debtor(s) may retain, in whole or in part, certain net income tax refunds during the term of the plan to facilitate the terms of this plan or to meet other reasonable and necessary needs of the Debtor(s).

*Id.* at ¶ 2.2.

In 2015, Debtors fell behind on the post–petition payments they were to make directly to the creditor holding their home mortgage[4] in the total amount of $4,161.68. To cure the arrearage, Debtors, Trustee, and the lender agreed to the entry of an order allowing Debtors to pay that arrearage via Trustee through the plan by increasing the plan payment by $109 per month. Dkt. No. 82.

Debtors filed their 2014 tax return and in 2015 received a federal tax refund totaling $2,919. This refund included no amounts for any earned income credit ("EIC") or additional child tax credit ("ACTC"). In accordance with the plan provision quoted above, $1,066 from the federal refund was used to pay taxes owed to the State of Idaho, and Debtors remitted the balance of the refund, $1,853, to Trustee. Dkt. No. 112 at ¶ 4.

For the 2015 tax year, in 2016, Debtors received another federal refund, this time totaling $5,610. This amount was comprised of an $1,853 overpayment of taxes withheld from their income, an EIC of $1,915, and $1,842 from an ACTC. *Id.* at ¶ 5. Of the total refund, $915.69[5] was offset to pay a 2014 tax liability, and $4,694.31 was paid to Debtors. *Id.* Debtors also received an income tax refund from the State of Idaho in the amount of $679. *Id.*

Of the total 2015 tax refunds, $6,289, Debtors have given only $1,187 to Trustee,

---

4. In the parties' facts, as well as at the hearing, Debtors spoke only of the arrearage on their mortgage. However, Debtors also were delinquent on plan payments to Trustee, due to confusion about when their payments should begin. Dkt. Nos. 76, 89. At confirmation, the plan payment arrearage was $2,750. Dkt. No. 76. To cure it, Debtors agreed at confirmation to pay an additional $62 per month above the usual plan payments beginning in August 2015, and continuing until the arrearage was fully cured. Moreover, there was apparently an arrearage that occurred because of an incorrect amount on the wage withholding order, as well as one due to miscommunication by Debtors' counsel to Debt-

ors regarding the amount they needed to turn over to Trustee. Dkt. No. 89 at ¶ 2. The source of the arrearage is not necessarily important; suffice it to say that as of December 31, 2016, the total amount of the arrearage was $8,055. Dkt. No. 112 at ¶ 6.

5. This amount was owed to the State of Idaho and was supposed to be paid from the 2014 offset, but apparently was not. The parties agree that Trustee cannot give Debtors a credit for the $915.69 offset. Dkt. 112 at ¶ 5. This amount will be included in the total tax refund received by Debtors for the 2015 tax year.

and retained $5,102. *Id.* On October 10, 2016, Debtors filed a motion to modify their confirmed plan to allow them to use tax refunds to cure the accrued arrearage; they did not seek modification of any other provision in their confirmed plan, including the provision addressing tax refunds. Dkt. No. 89.

On November 7, 2016, Debtors amended their schedules to disclose the 2015 income tax refunds, as well as to claim the EIC and ACTC amounts exempt. Dkt. No. 96. Trustee initially opposed the exemption claim, but she later withdrew her objection. Dkt. No. 121. However, Trustee objected to Debtors' motion to modify on several grounds. Most notably, Trustee argued that Debtors should not be permitted to claim the 2015, post–bankruptcy, EIC and ACTC amounts exempt. In the alternative, if the credit amounts were exempt, then Trustee contends that the credits must, nonetheless, be included in Debtors' income calculations, and as a result, are available to be paid into the plan. Finally, Trustee urged that Debtors should not be allowed to "retroactively modify" the provisions of their confirmed plan which required turnover of the tax refunds. Dkt No. 94.

On December 19, 2016, Trustee filed a separate motion to modify the confirmed plan, or alternatively, to dismiss the case, because Debtors had received increased income which should have been paid into the plan. Dkt. No. 107. Debtors objected to Trustee's motion. Dkt. No. 111. As noted above, after a hearing, the Court took the motions under advisement.

*Analysis and Disposition*

### I. Debtors' Motion to Modify

As it was the first filed, the Court initially considers Debtors' motion to modify their confirmed plan in which they seek to use the tax refunds to cure their plan payment arrearage. Debtors suggest that, between the wage withholding order issued by the Court to their employer, as well as the additional amounts above the plan payments they are currently committed to pay toward the arrears, at the conclusion of 54 months, the arrearage will amount to $5,865.31. Though they are not required by the Code to do so, through their modification, Debtors propose to extend the term of their plan to 60 months, and to continue to pay the same $821 [6] monthly payment during those additional six months, with those "additional" payments committed to reducing the arrearage. While this approach will result in no additional distributions to their creditors, Debtors project this will reduce the arrearage to a mere $939.31. Upon conclusion of their plan, Debtors propose to pay the remaining arrearage from their "fourth year" tax refunds. Additionally, they propose that any additional amounts they pay into the plan, including exempt tax refunds, should be applied to reduce the arrearage and potentially shorten the plan term. Finally, Debtors seek to use the now–exempt 2015 EIC and ACTC portions of their 2015 tax refund to pay toward the arrearage, which could also potentially shorten the plan.

While Debtors' proposed modification is multi–faceted, it is important to note what Debtors do not ask to do. They do not seek

---

**6.** There is some confusion about the amount of the payments Debtors are currently making. In their motion, Debtors refer to the "$821 monthly payment" while Trustee in her motion references increasing their plan payments "from $650 per month" to $1,150. Dkt. Nos. 89 at ¶ 4 and 107 (final paragraph). While the base monthly payment in the plan is $650, the prior plan modifications designed to cure other arrearages increased the payment to $821 ($650 + $62 + $109 = $821).

to modify the terms of their confirmed plan to have future EIC's and ACTC's (the "tax credit" portions of their federal tax refunds) treated differently from that portion of their refunds attributable to overpayment of taxes through withholdings. Rather, implicit in Debtors' motion, is their request that the Court determine that refundable federal tax credits, such as EIC and ACTC, are not included within the term "tax refund," as used in their confirmed plan. If the Court accepts Debtors' tacit invitation, it means, effectively that, under the terms of their plan, Debtors are not, and never were, required to turn those amounts over to Trustee.

### A. Modification Basics

 The Code permits modification of a plan following its confirmation under several circumstances, of which two are potentially relevant here: (1) to increase or reduce the amount of payments on claims of a particular class provided for by the plan; and (2) to extend or reduce the time for such payments. § 1329(a). When a modification is sought, this Court must then decide whether the proposed modification complies with § 1329(b)(1), which provides that "[s]ections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section." This reference to § 1325(a) requires, among other things, that a modified plan be proposed in good faith under § 1325(a)(3). Good faith determinations are made on a case–by–case basis after considering the totality of the circumstances. *In re Mattson*, 468 B.R. at 367 (citing *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224–25 (9th Cir. 1999); *550 W. Ina Rd. Trust v. Tucker (In re Tucker)*, 989 F.2d

328, 330 (9th Cir. 1993); *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 & n.9 (9th Cir. 1982); *Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 352 (9th Cir. BAP 1997)); *In re Stitt*, 403 B.R. 694, 700 (Bankr. D. Idaho 2008). The burden of establishing good faith rests with Debtors. *In re Stitt*, 403 B.R. at 700 (citing *Smyrnos*, 213 B.R. at 352). Whether to approve a plan modification under § 1329 is discretionary. *Mattson v. Howe (In re Mattson)*, 468 B.R. 361, 366 (9th Cir. BAP 2012).

### B. The Tax Credit Portions of Debtors' Refunds [7]

In chapter 13 cases, because the Code does not mandate otherwise, debtors may choose how to treat the tax refunds they anticipate receiving during the plan term. *See* § 1322(b)(11) (instructing that a chapter 13 plan may include "appropriate provision[s]" not inconsistent with the Code.) Although it may be varied under appropriate circumstances, this District has adopted a form chapter 13 plan which contains the provision quoted above for use in cases where the debtors project they will receive "tax refunds." L.B.R. 2002.5(e) (requiring that a debtor "use the standard approved chapter 13 plan ... for this district with such alterations as may be appropriate in a particular case.") Debtors' confirmed plan conforms to the District's form.

 As a practical matter, if a proposed plan commits tax refunds to plan payments, the debtors may simply agree to turn them over to the trustee when received, or the debtors may prorate the expected refund over 12 months, thereby increasing their current monthly income by one–twelfth of the expected annual refund. If the debtors' reasonable expenses

---

**7.** The Court need not distinguish between the EIC and the ACTC in this decision, as the differences between them "are insignificant for chapter 13 bankruptcy purposes." *In re Skougard*, 438 B.R. 738, 741 (Bankr. D. Utah 2010).

offset the anticipated refund, the debtors would not need to pay any additional amounts over to the trustee. In this way, chapter 13 trustees are not automatically entitled to receive the debtors' tax refunds, even though the plan may not pay creditors' claims in full.

### 1. The Parties' Arguments

Of course, in this case, Debtors committed, via their confirmed plan, to pay over to Trustee all "tax refunds" they received during the applicable commitment period. Via their proposed modification, they now seek to allow exceptions to that plan provision, arguing that, because refundable federal "tax credits" are exempt, they should not constitute "tax refunds," which are not exempt, and thus Debtors should not be required to give them to Trustee to distribute to their creditors.

Trustee counters with two arguments, effectively seeking to force Debtors to elect one of two approaches to dealing with their plan payment predicament and the tax credits. First, Trustee reminds Debtors that, in their confirmed plan, they agreed to pay over *all* tax refunds, which includes the amounts attributable to the EIC and ACTC, and that they are bound by that agreement unless the plan is modified. Moreover, even if they modify the confirmed plan to allow them to retain the tax credits, such changes can only impact their obligation to turn over the credits going forward, not retroactively. According to Trustee's second argument, if Debtors intend to keep the EIC and ACTC portions of their tax refunds going forward, then they must factor them into their projected disposable income calculations to determine the amount of future monthly plan payments. Under either of these arguments, Trustee urges the Court to reject Debtors' proposed plan modification.[8]

### 2. Are the Tax Credits "Tax Refunds" for Purposes of Debtors' Chapter 13 Plan?

■ Though Trustee disagrees, Debtors argue that, because they are exempt, refundable federal tax credits should be regarded as fundamentally "different" from the income tax withholding portions of their "tax refunds." Therefore, in Debtors' view, their confirmed plan should not be construed to bind them to give the credit funds to Trustee.

Debtors' argument runs counter to the long–standing case law in this District. In *In re Stevens*, 90 I.B.C.R. 386 (Bankr. D. Idaho 1990), a chapter 13 trustee filed a motion for turnover seeking an order compelling the debtors to pay over their tax refunds based upon a provision in the confirmed plan requiring debtors to pay to the trustee, "all tax refunds due the debtor(s) during the term of the plan in excess of $600 per year." *Id.* A substantial portion of debtors' tax refunds were attributable to the EIC. In resisting the trustee's request for turnover of the tax credit, debtors pointed to language in an earlier decision from this Court, stating:

> The normal income tax refund is an amount actually deducted from taxpayer earnings in excess of the amount required by accurate computation of the rate applied to actual income .... the

**8.** While Trustee originally objected to Debtors' exemption claims for both the EIC and ACTC portions of their refund, she withdrew that objection. Thus, in addressing the parties' positions, the Court assumes that those funds are exempt. *See In re Jones*, 107 B.R. 751, 752 (Bankr. D. Idaho 1989) (the EIC "due to its nature as social welfare relief is exempt property pursuant to Idaho Code § 11–603(4)") and *In re Farnsworth*, 558 B.R. 375, 381 (Bankr. D. Idaho 2016) ("Debtors' exemption claim for the portion of their 2015 federal tax refund attributable to the ACTC under Idaho Code § 11–603(4) is proper.")

earned income credit is given effect through refund, but it is not a refund of taxes previously paid ... the effect of the earned income credit legislation is to put money in the pockets of certain needy taxpayers after tax returns are filed, and not to reduce their tax burden during the tax year.

*In re Jones*, 107 B.R. at 752 (quoting *In re Searles*, 445 F.Supp. 749, 752 (D. Conn. 1978)). Based upon the Court's statement in *Jones*, the debtors in *In re Stevens* argued that EIC refunds ought to be treated differently than income tax refunds.

 The Court disagreed with the debtors. While the quoted language in *In re Jones* was appropriate in the context in which it was written—that of considering whether the EIC benefits were exempt under Idaho law—it concluded that any differences between tax credits and refunds were not germane in determining the meaning of the provision in the debtors' confirmed plan. As the Court explained:

[I]n interpreting this provision of Debtors' plan, the Court need not and should not attach technical definitions to commonly used terms. To do so would make administration and understanding of a plan's terms unduly complicated to debtors, creditors and trustee.

Here, while technically correct, few would initially recognize the distinction advocated by Debtors between the terms "tax refund" and "earned income credit." Because of this, most would likely assume, in the Court's opinion, that when the plan calls for tax refunds to be surrendered to the Trustee, this would include all sums remitted to Debtors by the Internal Revenue Service. In addition, if the difference is significant to Debtors, the plan may be drafted initially in such a manner as to fairly advise

all concerned that the earned income credit may be subject to special treatment.

*In re Stevens,* 90 I.B.C.R. at 387.

As in *In re Stevens*, in this case, while the statutory purpose for the EIC and ACTC "tax credits" paid to Debtors technically differs from the amounts withheld from their income, the Court declines to require debtors, creditors, and trustees to assign such a fine distinction in understanding the meaning of the provisions of this District's form plan. Instead, for simplicity and fairness, the Court prefers a more generic definition for the plan's provision: "tax refunds" encompasses all payments received by debtors from the state or federal government as a result of the filing of the debtors' tax returns. As this Court noted in *In re Stevens*, here, if debtors wish to retain the "tax credit" portions of their tax refund, they may include specific provisions in their proposed plan to make that clear. *See e.g., In re McCormick*, 354 B.R. 246, 254 (Bankr. C.D. Ill. 2006) (construing a plan provision which required debtors to "to turn over to the Trustee 100% of all Federal and State income tax refunds received by them during the term of the Second Amended Chapter 13 Plan, excepting only any Federal income tax refund constituting earned income credit."); *In re Royal*, 397 B.R. 88, 91 (Bankr. N.D. Ill. 2008) (plan requiring that the debtor "pay to the Chapter 13 trustee any federal income tax refunds received during the first three years of this plan; HOWEVER, this shall not include any earned income credit received by debtor.")

As noted above, the Code did not restrict Debtors' prerogative to propose in their plan that they retain and utilize exempt refundable tax credits. However, once confirmed, the terms of a chapter 13 plan bind not only creditors and the trus-

tee, but also the debtors. § 1327(a). While the Court's decision acknowledging the exempt status of ACTC benefits is recent,[9] EIC payments have been held to be exempt in this District for nearly 30 years. Because Debtors here pledged to "turn over to the Trustee all net income tax refunds" during the applicable commitment period of the confirmed plan, the Court concludes that their plan requires them to turn over the EIC and ACTC portions of their 2015 tax refunds to Trustee for distribution to their creditors.

### 3. Retroactive Modification

■ Debtors argue, alternatively, that the plan provision mandating turnover of their tax credits to Trustee may, nonetheless, be "retroactively" modified, and they propose to do just that so they may retain the 2015 EIC and ACTC.[10] The Court declines to allow such a modification under these facts.

■ The Code is unclear on whether a plan requiring payments may, after the debtor's payment obligation arises, may be modified to relieve the debtor of that duty. Debtors' position is arguably correct in that § 1329(b)(2) provides that "[t]he plan as modified becomes the plan ...." However, the courts that have considered so-called retroactive modification situations have not favored them. Many of those plan modifications were proposed by chapter 13 trustees who, upon learning that debtors had realized a significant increase in income after confirmation, sought to capture the benefit of the increased income for creditors. *See e.g., In re Wilhelm,* 2016

WL 5478471 at *3 (Bankr. D. Kan. Sep. 29, 2016) (rejecting a trustee's argument that "fairness" required retroactive modification of the plan to increase debtor's monthly payments to "catch" debtors' increased post–confirmation income because it "runs afoul of several Code sections .... Just as a debtor cannot retroactively reduce her payments via modification, a trustee or creditor cannot seek to retroactively increase a debtor's payments."); *In re Pautin,* 521 B.R. 754, 765 (Bankr. W.D. Tex. 2014) (observing in this context that "the Court cannot wind the clock back to recover income that has been spent or dissipated"); *In re Beam,* 510 B.R. 399, 406 (Bankr. N.D. Ga. 2014) (noting "section 1329 does not allow a debtor to retroactively reclassify the status [of a creditor and strip its lien] when the confirmed plan provided for treatment of the claim."); *In re Self,* 2009 WL 2969489 (Bankr. D. Kan. Sep. 11, 2009) ("any such modification can only be made prospectively, and based upon Debtors' current monthly disposable income."); *In re Walters,* 223 B.R. 710, 713 (Bankr. W.D. Mo. 1998) ("the Court finds no mention or implication in [the Code] that the amended plan provisions should be applied retroactively. ... the amended plan terms simply become the new terms. The replacement does not alter obligations which have already accrued."). In many cases, the enhanced income received by the debtors had already been spent, the debtors could not make increased plan payments going forward, and the courts concluded that allowing a retroactive increase in payment would render the modified plan infeasible. Similarly, if income

---

**9.** The 2016 decision of *In re Farnsworth* overruled *In re Steinmetz,* 261 B.R. 32 (Bankr. D. Idaho 2001), which reached a contrary decision. The latter decision was made on the basis of numerous amendments to the underlying legislation, signaling the credit's intended benefit to low income families.

**10.** In their motion, Debtors do not characterize their proposal to retain the tax credits as a retroactive modification; they consider the change to be a needed clarification of the term "tax refunds" in their plan. The Court has rejected such suggestion above.

decreased significantly after confirmation, yet the debtor has somehow managed to continue to make required plan payments, courts have concluded that the debtor should not be able to retroactively modify the plan to obtain a "refund" of the amounts "overpaid." The general theme of these cases is that the binding provisions of a confirmed plan operate as a contract, and, absent compelling facts justifying a different approach, the parties must respect those terms until the plan is modified, breached, or concluded.

Accordingly, reading Debtors' motion to modify their plan to request, in part, that they be permitted to retroactively retain the EIC and ACTC portions of their 2015 refund, their motion is denied.

### 4. Trustee's Projected Disposable Income Argument

The second argument Trustee makes in opposition to Debtors' motion to modify is that, if Debtors are allowed to keep any portion of their tax refunds, they must in any event include those funds in determining their projected disposable income under the modified plan going forward. *See* § 1325(b)(1).

█ A modified plan must satisfy the confirmation requirements in § 1325(a). Under the test adopted in the Code, if a creditor or the trustee objects to confirmation of a plan, a debtor must either pay unsecured creditors in full, or demonstrate that all "projected disposable income" to be received by the debtor over the duration of the plan "will be applied to make payments" into the plan. § 1325(b)(1); *Hamilton v. Lanning*, 560 U.S. 505, 508–09, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010). While the Code leaves "projected disposable income" undefined, it specifies how "disposable income" is to be calculated. This calculation imports another defined term, "current monthly income," which in-

cludes "income from all sources that the debtor receives ... without regard to whether such income is taxable income ...." § 101(10A)(A). In performing this calculation, the Code excludes certain kinds of income, such as Social Security benefits, payments to victims of war crimes, etc.; the Code does not exclude payments received by debtors under welfare programs and as public assistance benefits. § 101(10A)(B). Accordingly, here, Trustee contends that Debtors' EIC and ACTC payments must be included in calculating their projected disposable income, and modified plan payments, going forward. But Trustee is only partly correct.

If Debtors intended to retain their exempt EIC and ACTC refundable tax credits from payments under their plan, Trustee is right that they must factor those amounts into their projected disposable income. *See In re Blake*, 565 B.R. 871, 877 (Bankr. N.D. Ill. 2017) (explaining "exemptions do not allow a debtor to keep their tax credit out of the current monthly income calculation .... [a]ccordingly, the Debtors ... can keep their tax credit portion of their tax refund by including a prorated version (EIC and [Child Tax Credit] divided by twelve) of it in their [current monthly income]"; *In re Forbish*, 414 B.R. 400, 403 (Bankr. N.D. Ill. 2009) (noting that debtor's "exemption of her anticipated 2008 refund based on her earned income credit has no effect on the disposable income calculation. The claimed exemption does not matter because BAPCPA resolved the dispute over whether exempt assets are included in disposable income. ... [and] earned income credits are not an excluded form of income."); *In re Royal*, 397 B.R. 88, 94 (Bankr. N.D. Ill. 2008) (stating that "the earned income tax credit is income under the Bankruptcy Code, and must be included in the calculation of a debtor's [current monthly in-

come]. Since the earned income credit is not 'child support payments, foster care payments, or disability payments for a dependent child,' 11 U.S.C. § 1325(b)(2), it is also included in 'disposable income'. . . . The court finds that Royal's plan must provide that the earned income tax credits she receives during the applicable commitment period are applied to make payments to her unsecured creditors."); *In re Sohn*, 300 B.R. 332, 337 (Bankr. D. Minn. 2003).

■ But Trustee is misguided in insisting that the disposable income rules for confirmation must be applied when a debtor proposes to modify a plan. In connection with a § 1329(a) modification, a strict application of the "best efforts" test of § 1325(b)(1)(B) is not required, and Debtors need not demonstrate that all of their projected disposable income is devoted to making plan payments under the modified plan. *In re Sunahara*, 326 B.R. 768, 781 (9th Cir. BAP 2005) ("Section 1329(b) expressly applies certain specific Code sections to plan modifications but does *not* apply § 1325(b). Period.") (emphasis in original); *In re Mattson*, 468 B.R. at 370 (citing *In re Sunahara*, 326 B.R. at 781–82). In other words, Trustee's argument, that if Debtors are permitted to modify their plan going forward to retain EIC and ACTC payments, then the Code requires them to include those amounts in the disposable income test under § 1325(b), goes too far.

■ However, the Code is clear that the Debtors' modified plan must be proposed in good faith. § 1325(a)(3). Given that the EIC and ACTC payments to Debtors are intended to supplement their income to pay their living expenses, it would be a strange result were the Court to decline to consider those funds, in some fashion, when deciding whether the modifications to the plan Debtors have proposed satisfy good faith. However, as the Court has already held that Debtors may not modify their plan retroactively to capture those EIC and ACTC funds from the 2015 tax return, and Debtors have not sought to modify their plan to capture future EIC and ACTC payments, this discussion is academic at the present.

In summary, because the strictures of § 1325(b) do not bind Debtors in the context of modification, if Debtors were able to retain the 2015 EIC and ACTC funds, there is no requirement that they demonstrate that they have committed all of their projected disposable income to their plan payments. As such, Trustee's reliance on the projected disposable income test is misplaced in this case. Rather, any such arguments must be couched in the concept of good faith.[11]

### B. Use of Fourth Year Tax Refunds

■ In their motion to modify, Debtors seek to use at least a portion of their tax refunds to be received in the fourth year of their plan to help cure the arrearage. To the Court, this would not seem to require a plan modification. The confirmed plan provides that *"[d]uring the applicable commitment period of the plan,* as defined in 11 U.S.C. § 1325(b)(4), the Debtor(s) will turn over to the Trustee all net income tax refunds." Dkt. No. 63 at ¶ 2.2 (emphasis supplied). The applicable commitment period for Debtors in this case is three years. Dkt. No. 14. As such, the confirmed plan does not require them to turn over the tax

---

11. The projected disposable income and good faith tests have always been separate. *In re Meek*, 07.2 I.B.C.R. 23, 33 (Bankr. D. Idaho 2007) (citing *In re Nelson*, 343 B.R. 671, 677 n.10 (9th Cir. BAP 2006)) (explaining that whether a plan has been proposed in good faith is independent of whether the debtor has committed his/her best efforts to the plan under § 1325(b)). In the modification context, one is simply not applicable.

refunds beyond those received during the first 36 months of their plan. Thus, Debtors should be able to use any tax refunds after month 36 for whatever purpose they choose. It appears they wish to use these funds, at least in part, to cure the arrearage, and they wish to do it through the plan. This would not harm or deprive the other creditors, as they were not entitled to those tax refund monies according to the confirmed plan at any rate. There is no indication of bad faith in proceeding in this fashion. Therefore, the Court concludes that the use of so-called "fourth year" tax refunds to partially cure the arrearage is an acceptable modification to their plan.

### C. Extension of Plan Duration to Cure Arrearage

█ Debtors also propose to extend their plan by an additional six months to the maximum plan duration of sixty months, and to use those last six months of plan payments exclusively to cure their arrearage. Again, this represents a purely voluntary commitment by Debtors, as their applicable commitment period is only three years. Moreover, while this action would benefit only one particular creditor—their mortgage lender—it would not correspondingly harm their other creditors, as they would still receive the same amount they would have under the confirmed 54–month plan. There is no question of bad faith in this proposal, and the Court discerns no reason to deny this proposed modification.

Finally, Debtors also seek permission to shorten the plan duration if they can cure the arrearage more quickly. This proposition also seems unobjectionable, so long as their creditors get the equivalent amount Debtors committed to pay them over fifty-four months.

### II. Trustee's Motion to Modify

█ Trustee's separate motion to modify the confirmed plan, or to dismiss, alleges that Erika's[12] income has increased by $518 per month, and that Debtors did not file amended schedules or report the change in income, as they were required to do. Accordingly, Trustee seeks either modification of the confirmed plan to reflect Debtors' increased disposable income, or dismissal of the case for Debtors' failure to comply with the confirmation order. In its discretion, the Court concludes that dismissal is not warranted here, but instead, will consider Trustee's modification request.

In response, Debtors contend that any increases in income were the result of bonuses received by Erika, and that she will not receive increased income going forward. They agree that an increase in plan payments may be warranted due to the payment of the bonuses, but that the amount proposed by Trustee is not justified.

At the time the Court confirmed Debtors' chapter 13 plan, Erika's gross monthly income was $1,400, and after deductions, her net pay was $1,200. Dkt. No. 73. Her income, combined with Jose's, generated a monthly plan payment of $210 per month for the first two months, then $650 per month for 52 months, with an additional $62 per month added by the confirmation order to pay off the arrearage at that time. Dkt. Nos. 63, 76. By agreement of Debtors and Trustee, the Court later ordered that the plan payment increase by $109 per month to cure the mortgage arrearage. Dkt. No. 82.

At the time the modification motions were filed, Debtors filed amended schedules I and J reflecting that Jose's monthly income was nearly unchanged, at $3,004.21

---

12. The Court uses the parties first names sole- ly for clarity; no disrespect is intended.

**634**

gross, and $2,588.71 net, while Erika's income had risen to $2,066.67 gross, and $1,755.23 after deductions. Debtors explain that while Erika's base income has not increased, she received certain nonrecurring bonuses, such that her increased income in the amended schedule I will not reflect her actual income going forward. In light of the increase in Erika's income by over $500 per month, Trustee asks the Court to order Debtors to increase plan payments from $650 to $1,150 per month. Dkt. No. 107. Debtors agree that, based on the bonuses, they can increase their plan payments somewhat, but not nearly as much as Trustee requests. They have not suggested a payment amount to counter Trustee's request.

The Court was given Erika's bi–monthly pay stubs from July 16, 2016, through October 15, 2016. Dkt. No. 101. Each of those stubs shows that her base pay was $750, but that she was paid a bonus of $400–500 for each of the six pay periods represented. Dkt. No. 105. The latest pay stubs indicate that through November 15, 2016, Erika was paid a total of $2,950 in bonuses during 2016. However, not all pay stubs include bonus pay. For example, the pay stubs from October 16, 2016, through November 15, 2016, indicate the base pay of $750 remains constant, but no bonuses were paid during that time. Dkt. No. 105.

Assuming that 23 pay periods had passed in 2016 by the time Erika received her paycheck on November 15, 2016, and assuming there are 26 total pay periods within the year, her bonuses averaged $128.26 per check. However, as the pay stubs show, taxes are withheld from the

bonus amounts; those taxes appear to amount to about 16% of her gross pay.[13] Using this information, if the Court assumes Erika received, on average, a bonus of $128.26 per pay period, after deducting taxes, her net bonus pay averaged $107.74 per pay period.[14] While obviously an imprecise calculation, on this record, the Court finds and concludes an additional $108 per month sum should be paid into Debtors' modified plan.

### *Conclusion*

For all of the above reasons, the Court concludes that, as a package of proposals, Debtors' motion to modify their plan should be denied. Debtors are bound by the terms of their confirmed plan. Interpreting its provision proposing that all "tax refunds" they receive during the applicable commitment period be paid over to Trustee, the Court concludes Debtors must tender their 2015 EIC and ACTC refundable federal tax credits to Trustee, even though those credits are exempt. The Court also concludes that, in this case, Debtors may not retroactively modify their plan to treat the EIC and ACTC portions of their refund differently.

However, the Court rejects Trustee's argument in response to Debtors' motion to modify their plan that, if they retain the EIC and ACTC payments, Debtors must factor those funds into their projected disposable income under § 1325(b) to determine the amount of any modified monthly plan payments. While, generally speaking, EIC and ACTC funds are properly consider in determining disposable income, and those payments are relevant to any good

---

**13.** For example, for the pay period of September 1–15, 2016, Erika's gross salary, including bonuses, was $1,250 and her net pay, after taxes were withheld, was $1,048.37. This indicates Erika received about 84% of her gross pay, which conversely indicates that about 16% in taxes were withheld. ($1,048.37 ÷

$1,250 = .838). This is approximately the same figure in all her paychecks in the record.

**14.** $128.26 x .16 = $20.52 in taxes deducted. $128.26 − $20.52 = $107.74.

faith analysis of a proposed plan modification, because the Court has concluded that there is no mechanism by which Debtors may retain the EIC and ACTC portions of their 2015 tax refund in this instance, those issues do not come into play in this case.

While Debtors' proposed modifications to their plan will not be approved, should Debtors propose another modified plan, Debtors may use their "fourth year" tax refunds to partially cure their plan payment arrearage. In that modified plan, Debtors may also add six months to the plan term, making it a 60-month plan, and commit all payments made during the final six months to pay their arrearage. Neither of these modifications will prejudice any creditors.

Trustee's motion to modify the plan will be granted, but only in part. While Trustee's motion seeks to increase Debtors' plan payments by $500 per month, the proof does not support that proposal. Instead, on this record, the Court concludes that Debtors' plan payments should increase, in round numbers, by $108, to $929 [15] each month for the remainder of the plan.

Because the Court rejected Debtors' proposal for paying the arrearage, they must further address this problem. Debtors may propose another modified plan consistent with this decision. If they do not, Trustee may move to dismiss the case.

---

**15.** Debtors base plan payment will increase from $650 to $758, plus the $62 and $109 additional arrearage payments previously approved. The new total monthly payment will be $929.